UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSE GUTIERREZ,

                                          **DECISION AND ORDER**
                Petitioner,               **No. 11-CV-1034(MAT)**

        -vs-

MARK L. BRADT,


                Respondent.

_____

## I.    Introduction

*Pro se* Petitioner Jose Gutierrez ("Petitioner") has filed a
timely petition for a writ of habeas corpus under 28 U.S.C. § 2254
challenging the constitutionality of his custody pursuant to a
judgment entered May 15, 2003, in New York State, Supreme Court,
Monroe County, convicting him, after a jury trial, of Assault in
the First Degree (N.Y. Penal Law ("Penal Law") § 120.10[1]).
Petitioner was sentenced, as a second felony offender, to a
determinate term of 25 years imprisonment, with five years post
release supervision.

## II.   Factual Background and Procedural History

Monroe County Indictment No. 2006-351 charged Petitioner with
Murder in the Second Degree (Penal Law § 125.25[1]) and First
Degree Assault (Penal Law § 120.10[1]).  The charges arose from a
shooting incident that occurred at a house party in Rochester,
New York on February 24, 2002, in which Petitioner, acting with two
others, shot Lazaro Perez ("Perez") and Bernardo Gilbert

("Gilbert") multiple times, seriously injuring Perez and killing Gilbert.

**A.    The Trial**

**1.    The Prosecution's Case**

Perez testified that in 2002, he had known Petitioner (a/k/a Flaco), for about a year from seeing him at various Rochester clubs. Trial Trans. [T.T.] 1218-1221. During that time, Perez saw Petitioner two to three times a week. T.T. 1222. Prior to February 23, 2002, Perez never had any trouble with Petitioner. T.T. 1349. Perez also knew a man called Longo (a/k/a Longuito) from the local bars, and he knew a man called Chamo, who he saw in the clubs once or twice weekly in 2002. T.T. 1240-1242.

At about 3:00 p.m. on February 23, 2002, Perez was outside a store on Clinton Avenue in Rochester with his close friend, Gilbert. T.T. 1223, 1373. Petitioner drove up and called Perez over so that he and Perez could talk without Gilbert's hearing him. Petitioner, who was alone in the car, asked Perez if he had seen an individual called El Gordo, and Perez replied that he had not. T.T. 1223-1224, 1375. Perez noticed a revolver on the passenger seat of the car. T.T. 1226, 1370, 1375. Petitioner then drove away. T.T. 1228.

At about 10:30 p.m. that same day, Jessica Lopez ("Lopez") went to Lisandro's bar where she saw Petitioner and Longuito. T.T. 1756-1757, 1759, 1762. At about 2:00 a.m., Lopez held an

after-hours party at her apartment, which was the upstairs unit of a two-apartment residence at 81 Clifford Avenue in Rochester. Lopez sold beer from her refrigerator.  T.T. 1772-1773.  She saw Petitioner and Longuito in her living room.  T.T. 1774.

Perez and Gilbert arrived at the party at 2:30 a.m.  He and Gilbert were in the kitchen, where Perez was talking to a woman. T.T. 1246, 1289.  Ten minutes later, Petitioner, Longuito, and Chamo came into the kitchen.  T.T. 1247.  Each man held a pistol or handgun.  T.T. 1256, 1445.  Petitioner shot Perez in the left hip. Then, from a distance of about four feet, Petitioner shot at Gilbert's eye.  T.T. 1250.  Chamo or Petitioner shot Perez in the arm as Perez took cover behind the open refrigerator door. T.T. 1250, 1430, 1435-1436.  Longuito told Perez not to move and then shot Perez in the hip.  T.T. 1252-1253, 1411-1412, 1417. Gilbert fell down and the three men ran downstairs.  T.T. 1255, 1433.

Lopez testified that, after she heard a single gunshot, she ran and hid under her bed.  T.T. 1759, 1994.  Although she had seen Gilbert in her kitchen, she testified that she never saw Petitioner or Longuito in the kitchen, and that she did not know if someone named Chamo was with them.  T.T. 1984-1985.  When she left her bedroom, she saw Gilbert and Perez in the kitchen.  T.T. 1760.

Down the street at 67 Clifford Avenue, Marcel McDowell ("McDowell") was in his grandmother's living room.  T.T. 1615,

1617, 1629. From the line of parked cars in the street and the music playing, he knew that someone up the street was having a house party. At about 2:30 a.m., he heard possibly two gunshots. T.T. 1616, 1622. A few minutes later, he saw, from the window, three people running from the house party. One put his hand in his coat "like he had a gun." T.T. 1616-1618, 1650-1655. The three people then entered a two-toned blue truck. T.T. 1648. The truck traveled down Clifford Avenue, passing McDowell's grandmother's house. T.T. 1619. McDowell then saw "a lot of Spanish people" running and yelling from the house party. T.T. 1620-1651. McDowell walked onto his grandmother's porch and called 911. T.T. 1620, 1648.

Officer Dennison Wright right responded to the call and arrived at Lopez's apartment at 2:47 a.m. T.T. 1656-1657, 1692. After a woman at the door told him that two shooting victims were upstairs, Officer Wright went upstairs to the kitchen. T.T. 1658, 1676-1678. He saw Gilbert, laying face down in a pool of blood, convulsing and unable to speak. T.T. 1658-1660, 1677. He saw Perez sitting with his back to an open refrigerator. T.T. 1661-1662. Officer Wright recovered a bullet fragment from near Perez's feet and a slug from the floor next to Gilbert's feet. T.T. 1665-1685, 1688.

Perez was transported by ambulance to Rochester General Hospital. T.T. 1260. There, orthopedic surgeon Terrence Daino

("Daino") observed that Perez sustained a total of five gunshot wounds: one to his right shoulder, one to his right thigh, one to his right tibia and fibula (resulting in a fracture), one to his left thigh (resulting in a fracture to his femur), and one to his left hip (resulting in a fracture). T.T. 1060-1069. Daino testified that Perez would have died of blood loss and/or infection had he not received prompt medical assistance. T.T. 1070-1071. During the six-hour surgery, Daino implanted a rod in Perez's right knee that ran to his ankle to hold the tibia and fibula together. T.T. 1070-1071. He also inserted a rod in Perez's left femur that extended from his hip to his knee to stabilize the fracture. T.T. 1071-1072.

Daino testified further that, as a result of the shooting, Perez had sustained a "long standing injury" to his left hip, and that Perez wore a leg-cast for two months. T.T. 1072. Daino testified that Perez would ultimately suffer from arthritis and bone deterioration. T.T. 1072-1073. Perez was discharged after a 16-day hospital stay, and walks with a cane and takes medication for continuing pain. T.T. 1260-1261.

At the crime scene, Officer Harold Langdon observed a "bullet strike" on top of the kitchen sink, which indicated to him that a bullet struck the wall below the molding. T.T. 1699-1700, 1709-1710, 1824-1825. He and other officers looked inside the wall but they were unable to locate a projectile. T.T. 1709-1710. Officer

Langdon found two more holes in the wall, and also located a projectile as well as a copper jacket. T.T. 1710-1712, 1811.

Officer Langdon also observed a bullet hole in the kitchen floor, and dug out a bullet from below the floor. T.T. 1712, 1812. He also found a bullet hole in the stove, and a bullet inside the stove. T.T. 1713, 1834, 1842. Although he saw a bullet hole in the ceiling, he found no corresponding bullet. T.T. 1713-1714, 1812, 1831, 1873. He testified that he found no bullet holes in any other room of the apartment, nor any weapons in any part of the apartment. T.T. 1716-1717.

Dr. Thomas Smith performed an autopsy on Gilbert's body. The autopsy established that Gilbert sustained a back wound that was not medically significant. T.T. 2008, 2017. Another bullet, which caused Gilbert's death, had entered his eye, traveled through his brain and exited his skull. Dr. Smith also recovered a bullet from Gilbert's skull. T.T. 2008, 2015-2017. Dr. Smith testified that based on the powder burn surrounding Gilbert's eye wound, the gun was discharged "a couple of feet and probably at the shorter end of that" away from Gilbert's face. T.T. 2014, 2026.

Firearms examiner Robert Stanton ("Stanton") examined the ballistics evidence recovered by Dr. Smith and Officer Langdon. Stanton testified that, in his opinion, two of the bullets were fired from the same gun to the exclusion of all other firearms. T.T. 1944-1945, 1955. These bullets were fired from a .38 or .357

caliber revolver, which was manufactured by one of five different companies. T.T. 1944. Stanton testified that two additional bullets recovered from the crime scene were of the same caliber as the first set of bullets. According to Stanton, both sets of bullets "ha[d] general rifling characteristics which are consistent with each other but that [he] [had] no way of determining whether they were fired from the same weapon or two different weapons." T.T. 1945-50, 1997.

The bullet recovered from Gilbert's scalp was a .38 caliber "semi-wadcutter type bullet" that was fired from a .38 or .357 caliber handgun. T.T. 1953, 2017. This bullet, however, was deformed, and Stanton therefore could not locate rifling characteristics on it. T.T. 1953, 1956. The bullet was similar to one of the second set of bullets that Stanton examined, in that both were semi-wadcutters and were of the same caliber. T.T. 1954.

On March 3, 2002, New York City Police Officer Thomas Witt was working on the corner of 187th Street and Ballantine Avenue in the Bronx. T.T. 1096-1097. At 7:10 p.m., he saw a black Isuzu Rodeo turn right without stopping at the stop sign at that intersection. T.T. 1099-1100. He and three other officers pulled the Isuzu over and the officers exited their car and began to approach the Isuzu. T.T. 1100-01. As they did, the Isuzu sped away. The officers pursued the Isuzu for three quarters of a mile, as it ran red lights and nearly struck other cars and pedestrians in the crowded

area.  T.T. 1101-04, 1116.  When the Isuzu was trapped in traffic
on Fordham Road, the driver and passenger abandoned the car and ran
into a clothing store.  T.T. 1104-05.  The officers arrested them
as they pretended to shop for clothes.  T.T. 1105-1106.  Petitioner
initially told  police his name was Luis Hernandez, but when
Officer Witt confronted him with his driver's license, Petitioner
admitted that his name was Jose Gutierrez.  T.T. 1106, 1114-115,
1133-1134.

Between July 21 and 31, 2002, Petitioner and Terrick Ficklin
("Ficklin") were housed on cell block 2M West in the Monroe County
Jail about five cells apart.  T.T. 1497-1500.  Prior to his
incarceration, Ficklin had seen Petitioner, whom he knew as Flaco,
near the neighborhood liquor store.  T.T. 1503, 1591, 1609.
Ficklin told Petitioner that he was from the Clinton Avenue area of
the city, and Petitioner asked him if he knew Perez.  T.T. 1504.
When Flickin said that he did, Petitioner asked Ficklin to offer
Perez $20,000 not to testify at his trial.  T.T. 1504, 1524, 1587.
Petitioner told him that Perez would know to get the money from
Petitioner's girlfriend.  T.T. 1504.  In a subsequent conversation,
Petitioner told Ficklin, with respect to the shooting, that he had
seen Perez outside of a club and Perez "pulled out a shotgun and
[Petitioner] told [Perez] to shoot.  Perez didn't shoot so he
walked off."  T.T. 1524, 1589.  Later, Petitioner saw Perez "in the
house" and Petitioner kissed Perez on the forehead and left the

party.  Petitioner then returned to the party with a friend and that was when the shooting occurred.  T.T. 1522, 1589, 1602-03.

## 2.  The Defense's Case

Paramedic Donna Lynn Weaver ("Weaver") testified that on the night of February 24, 2002, she responded to an incidence call from 81 Clifford Avenue.  T.T. 2056-2057.  There, Perez pointed to his leg and said that he had been shot.  T.T. 2060.  Perez's respiratory rate was "regular and shallow" at 3:01 a.m., and he was "alert" and complaining of pain while en route to the hospital.  T.T. 2065-2067.  Perez had lost a great deal of blood and was at risk for going into shock.  According to Weaver, his medical condition was "severe."  Perez asked Weaver in the ambulance whether he would live.  Weaver was concerned with Perez's condition and did not discuss the shooting with him.  T.T. 2076.  She did not recall Perez saying the name Flaco, but if he had, she testified that she "wouldn't pay attention to it."  T.T. 2077.

## 3.  Verdict and Sentencing

On December 17, 2002, the jury acquitted Petitioner of second-degree murder, but convicted him of first-degree assault. T.T. 2395.  On May 15, 2003, he was sentenced, as a second felony offender, to an indeterminate prison term of 25 years, plus five years of post-release supervision.  Sentencing Mins. [S.M.] 31, 49.

## 4.    Direct Appeal

Through counsel, Petitioner appealed his judgment of conviction on the following grounds:  (1) that the trial court erred in charging the jury that it could find Petitioner guilty as an accomplice, where the evidence did not support that theory, and that the court erred in limiting the theory of liability to accomplice liability; and (2) the trial court erred in allowing the prosecutor to re-open direct examination to ask Lopez whether Petitioner was at her house on the night of the shooting.  See Pet'r Br. on Appeal at Resp't Ex. A.  Petitioner received permission to file a *pro se* supplemental appellate brief, but he failed to timely do so, and sought an extension of time to file the brief three days after the Appellate Division decided the appeal.[1] The Appellate Division denied the extension motion as moot.  See Resp't Declaration in Opposition to Petition for a Writ of Habeas Corpus, ¶ 4 (Dkt. No. 8).

On June 11, 2010, the Appellate Division unanimously affirmed Petitioner's conviction.  People v Guitierrez,[2] 74 A.D.3d 1834 (4th

---

[1]

Petitioner's *pro se* appellate brief is attached as Respondent's Exhibit D. In it, Petitioner argued that: (1) the People failed to prove Petitioner's guilt beyond a reasonable doubt;  (2) the court erred in charging the jury that it could predicate Petitioner's guilt on an accomplice liability theory; (3) the court erred in admitting Perez's testimony that on the day of the shooting, he saw a handgun in a car in which Petitioner was driving; and (4) his sentence was excessive.  Because Petitioner failed to submit the brief before the Appellate Division decided the appeal, the Appellate Division did not address Petitioner's claims.

[2]

On the transcripts of the proceedings and in the state appellate courts, Petitioner's surname is spelled Guitierrez, but in the petition, Petitioner

Dep't 2010) (Resp't Ex. E); <u>lv. denied</u>, 15 N.Y.3d 852 (2010)
(Respt Ex H).

### 5.    The Motion for a Writ of Error Coram Nobis

On or about February 16, 2011, Petitioner filed a *pro se* coram
nobis motion in the Appellate Division, alleging that he received
ineffective assistance of appellate counsel because counsel failed
to raise the following issues on direct appeal: (1) that the People
had not proven Petitioner's guilt, as an accomplice, with proof
beyond a reasonable doubt; (2) that the trial court erred in
charging the jury that it could predicate a finding of guilt on
accomplice liability; (3) that the trial court erred in admitting
evidence that Perez saw a handgun on the passenger seat of the car
that Petitioner was driving on the day of the shooting; and
(4) that Petitioner's sentence was cruel and unusual, in violation
of the Eighth Amendment.  <u>See</u> Pet'r Coram Nobis Motion at Resp't
Ex. I.  On April 29, 2011, the Appellate Division summarily denied
Petitioner's motion.  <u>People v. Guitierrez</u>, 83 A.D.3d 1602
(4th Dep't 2011) (Resp't Ex. L).  The New York Court of Appeals
denied leave on September 20, 2011.  <u>See</u> Resp't Exs. M-N.

### 6.    The Habeas Corpus Petition

This habeas corpus petition followed, wherein Petitioner seeks
relief on the following grounds: (1) he was deprived of the

---

spells his name, Gutierrez.  To remain consistent with the public case citations,
the Court will use Guitierrez when citing to the state court proceedings.

effective assistance of appellate counsel; (2) the People failed to prove his guilt beyond a reasonable doubt; (3) the trial court deprived Petitioner of due process when it charged the jury that it could find Petitioner guilty on an accomplice liability theory; (4) the court erred in admitting Perez's testimony that he saw a handgun in Petitioner's car on the afternoon before the shooting; (5) Petitioner's sentence violated the Eighth Amendment; (6) the court erred in limiting the jury's consideration of the evidence to an accomplice liability theory; and (7) the court erred in allowing the prosecutor to re-open Lopez's direct examination. See Pet. ¶ 22, Points I-VII (Dkt. No. 1); Traverse/Brief (Dkt. No. 12).

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied,

-12-

464 U.S. 1048 (1984). As Respondent correctly argues, all of Petitioner's claims –- with the exception of his ineffective assistance appellate counsel claim -- are unexhausted. See Resp't Mem. of Law at 14-18.

## IV. The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

## V. Analysis of the Petition

## 1. Ground One of the Petition is Meritless

Petitioner argues, as he did in his coram nobis application, that his right to effective assistance of counsel "was violated when his assigned appellate counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Pet. ¶ 22, Point I. Specifically, Petitioner claims that appellate counsel was ineffective because she failed to argue that: (1) the People did not prove Petitioner's guilt beyond a reasonable

doubt; (2) the trial court erred in charging the jury that it could predicate a finding of guilt on accomplice liability; (3) the trial court erred in admitting evidence that Perez saw a handgun on the passenger seat of the car that Petitioner was driving on the day of the shooting; and (4) his sentence was cruel and unusual and violated the Eighth Amendment.[3]  <u>See</u> Pet. ¶ 22, Point I; Traverse/Brief at ¶¶ 1-9.  Because the Appellate Division adjudicated this claim on the merits when it summarily dismissed Petitioner's coram nobis application, the AEDPA applies. <u>Sellan v. Kuhlman</u>, 261 F.3d 303 (2nd Cir. 2001) (holding that a summary denial constitutes an adjudication on the merits); <u>see also Harrington v. Richter</u>, 131 S.Ct. 770, 784-785 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Under that standard, Petitioner's claim is meritless.

To establish ineffective assistance of counsel, a petitioner must satisfy the two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  "First, the defendant must show that counsel's performance was deficient.  This requires showing

---

[3]
In the habeas petition, Petitioner does not state specifically which issues his appellate counsel should have raised on direct appeal.  The Court therefore liberally construes his *pro se* pleadings as raising the same issues contained in his coram nobis motion.

that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. Second, the petitioner must show that counsel's deficient performance prejudiced his defense, id. at 692, which requires proving that, "but for" counsel's errors, there was a reasonable probability that the outcome of the proceeding would have been different. Id. at 694.

The Strickland standard on direct appeal is already "highly deferential," 466 U.S. at 689, but in the context of a federal habeas proceeding under AEDPA, the habeas court must apply a "doubly deferential judicial review" to a state court's decision on ineffectiveness claims. Knowles v. Mirzayance, 556 U.S. 111 (2009). Where, as here, the state court has adjudicated the merits of the petitioner's claim, and 28 U.S.C. § 2254(d)(1) applies, "the question is not whether counsel's actions were reasonable," but instead "is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 131 S. Ct. at 788 (2011).

"Although the Strickland test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted). In the appellate context, fulfilling the first prong of Strickland requires the petitioner to demonstrate that his attorney "omitted

significant and obvious issues while pursuing issues that were clearly and significantly weaker" on appeal. Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000). To satisfy the second prong of Strickland, the petitioner must show that but for appellate counsel's deficient performance, there is a reasonable probability that his appeal would have been successful before the state's highest court. Id. Petitioner cannot meet this standard.

Initially, Petitioner's appellate counsel submitted a thorough, well-researched brief, which persuasively argued the following two legal issues: (1) that the trial court erred in charging the jury that it could find Petitioner's guilt under an accomplice liability theory, and erred further in limiting the theory of liability to accomplice liability; and (2) that the trial court erred in allowing the prosecutor to re-open Lopez's direct examination to elicit testimony that Petitioner was in Lopez's apartment on the night of the shooting. See Pet'r Br. on Appeal at Resp't Ex. A. As Respondent points out, the issues raised in counsel's brief were preserved in the trial record and supported by relevant state law citations and specific references to the record. See Resp't Mem. of Law at 22-23. The Appellate Division reviewed both of these claims on the merits and disposed of them in a detailed opinion. See Guitierrez, 74 A.D.3d 1834. Appellate counsel then subsequently raised both of these issues in a three-

page letter requesting leave to appeal to the New York Court of Appeals.  See Resp't Ex. F.

Moreover, the record reflects that, appellate counsel did, in fact, make two of the legal arguments that petitioner claims she omitted, namely that: the People did not prove Petitioner's guilt beyond a reasonable doubt; and that the trial court erred in charging the jury that it could predicate a finding of guilt on accomplice liability.  Although, as Petitioner points out, appellate counsel framed these claims in state law terms (rather than raising them as violations of federal law) these claims implicate New York state law and were properly and persuasively argued as such.  In her appellate brief, counsel asserted that the trial court erred in charging the jury that it could find Petitioner guilty based on an accomplice theory of liability.  Although appellate counsel did not expressly pursue this claim as a traditional legal sufficiency argument, she argued that the evidence did not support a theory that Petitioner was acting as an accomplice on the night of the shooting.  See Pet'r Br. on Appeal, Point I at Resp't Ex. A.  Appellate counsel then proceeded to outline the People's proof requirements of accomplice liability, specifically citing to Penal Law § 20.00,  and argued that the evidence presented by the prosecution did not reasonably support the required elements.  Id. at 7-8.  Thus, appellate counsel presented the Appellate Division with the question of whether the

evidence supported submission of the case under New York's accomplice liability provision. The Appellate Division, in reviewing that claim on the merits, determined that "the evidence presented at trial supports that theory." See Guitierrez, 74 A.D.3d at 1834.

Appellate counsel also alerted the court to the question of whether the trial court erred in limiting the theory of liability to accessorial conduct. Appellate counsel raised this issue at page 8 of its appellate brief, and the Appellate Division denied it on the merits, holding that if the court had, by its instructions, limited the theory of liability, Petitioner would not have been prejudiced because "the court would have removed the possibility of conviction as a principal . . . ." Id. Thus, Petitioner has failed to demonstrate that he received ineffective assistance of appellate counsel based on counsel's alleged failure to raise two issues related to accomplice liability.

Further, appellate counsel cannot be faulted for failing to argue that the trial court erred in admitting Perez's testimony that he saw Petitioner on the afternoon before the shooting and that Petitioner had a handgun on the passenger seat of the car, and further that Petitioner's sentence was cruel and unusual in violation of the Eighth Amendment because both of these issues are meritless. See United States v. Arena, 180 F.3d 380, 386 (2d Cir.

1998) (appellate counsel cannot be faulted for failing to raise non-meritorious issues).

With respect to Petitioner's claim that appellate counsel was ineffective for failing to challenge the admission of uncharged crime evidence (i.e., Perez's testimony that he observed a handgun on the passenger seat of a car Petitioner drove on the afternoon of the shooting),[4] this claim is meritless because the admission of that evidence was proper under state law. Although the general evidentiary rule in New York provides that evidence of a defendant's prior or uncharged crime is inadmissible to prove the disposition or inclination of the defendant to commit another crime, (See, e.g., People v. Beam, 57 N.Y.2d 241 (1982)), an exception to that general rule provides that "evidence of other [prior or uncharged] crimes is competent to prove the specific crime charged when it tends to establish . . . the identity of the person charged with the commission of the crime on trial." People v. Molineux, 168 N.Y. 264 (1901); cf. Fed. R. Evid. 404(b) (evidence of other crimes admissible to prove identity). Unless the defendant's identity is "conclusively established," the exception set forth in Molineux allows the prosecution to prove the defendant's identity with evidence of past crimes. People v. Condon, 26 N.Y.2d 139 (1970) (emphasis in original).

---

[4] At a pre-trial hearing, the court ruled that this evidence of an uncharged crime was admissible on the question of Petitioner's identity. Hr'g Mins. of 10/25/2002 9-44.

Here, Petitioner's identity as the perpetrator of the crimes was not conclusively established by the other trial evidence. Perez was unable to state who specifically shot in Lopez's kitchen. Further, the ballistics evidence presented at trial reflected the use of two guns, but not necessarily three. Perez's testimony that he had seen Petitioner with a handgun earlier that day was thus relevant and probative on the issue of whether Petitioner had wielded a gun on the night of shooting and whether he was a shooting member of this group. It was therefore not error to allow Perez's testimony related to the handgun observed on the day of the shooting to be admitted into evidence as proof of Petitioner's identity as the perpetrator. Appellate counsel cannot be found deficient therefore for declining to raise what amounts to a non-meritorious claim on appeal.

The sentencing issue, for which Petitioner faults counsel for failing to raise on appeal, is also meritless because Petitioner was properly sentenced in accordance with New York law, and that there were no extraordinary circumstances that would have supported a discretionary reduction in his sentence. The trial evidence established that Petitioner was willing to bribe Perez not to testify, and that Perez sustained multiple, serious injuries that caused permanent disabilities. Moreover, Petitioner had previous convictions for assault and drug selling in Connecticut and possession of stolen property. S.M. 45. Petitioner did not and

does not now point to any extraordinary circumstance and/or factor(s) that would have warranted a sentence reduction by the Appellate Division, nor is any apparent on the record before this Court. Accordingly, appellate counsel cannot be found deficient for declining to raise this non-meritorious issue on appeal.

In sum, Petitioner's ineffective assistance of appellate counsel claim is meritless. The state court's adjudication of this claim did not contravene or unreasonably apply clearly established Supreme Court law. The claim is therefore denied in its entirety.

**2.  Grounds Two-Four, Six and Seven of the Petition are Unexhausted but Deemed Exhausted and Procedurally Defaulted**

Grounds two through four, six and seven of the habeas petition allege that the People failed to prove Petitioner's guilt beyond a reasonable doubt, that the court deprived Petitioner of due process when it charged the jury it could find Petitioner guilty on an accomplice liability theory, that the court erred in admitting Perez's testimony that he saw a handgun in Petitioner's car on the afternoon before the shooting, that the court erred in limiting the jury's consideration of the evidence to an accomplice liability theory, and that the court erred in allowing the prosecutor to re-open Lopez's direct examination are unexhausted for the reasons discussed below.

A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. See 28 U.S.C. § 2254(b)(1)(A); see also Picard v. Connor, 404 U.S.

270, 275 (1971); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "opportunity to pass upon and correct alleged violations of . . . [a] prisoner's federal rights." Picard, 404 U.S. at 275 (citation omitted).

The standards for presenting federal constitutional claims to state courts are not so stringent as to require the recitation of "book and verse on the federal constitution." Id. at 278 (citation omitted). However, the state courts must be "apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.'" Jones v. Vacco, 126 F.3d 408, 413 (2d Cir.1997) (quoting Daye, 696 F.2d at 191 (en banc)). Petitioners can ensure that state courts are "alerted to the fact that [they] are asserting claims under the United States Constitution," Duncan v. Henry, 513 U.S. 364, 365-66 (1995), by presenting their claims in a fashion demonstrating either (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation. Daye, 696 F.2d at 194; accord Petrucelli v. Coombe, 735 F.2d 684, 688 (2d Cir. 1984).

Once the state courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is generally fulfilled when those claims have been presented to "the highest court of the pertinent state." <u>Bossett v. Walker</u>, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).

With respect to Petitioner's claims that the People failed to prove his guilt beyond a reasonable doubt and that the court deprived Petitioner of due process when it charged the jury it could find Petitioner guilty on an accomplice liability theory, these claims were raised in Petitioner's counsel's appellate brief but were argued specifically as state law issues. <u>See</u> Pet'r Br. on Appeal, Points I-II at Resp't Ex. A. On direct appeal, appellate counsel framed these claims in state law terms, citing no federal authority, nor any constitutional provision or premise in making her arguments. <u>Id.</u> Consequently, the Court finds these claims to be unexhausted.

Similarly, Petitioner's remaining claims are unexhausted because they were not raised on direct appeal. Indeed, as Petitioner points out, he did raise these claims in his *pro se* supplemental appellate brief, but the claims were precluded from review based upon his failure to timely file his brief. <u>See</u> Resp't Declaration in Opposition to Petition for Writ of a Writ of Habeas

Corpus, ¶ 4.[5]  Furthermore, although Petitioner sought review of these claims in his *pro se* leave letter to the New York Court of Appeals, that letter did not serve to exhaust any of those unexhausted claims.  A petitioner has not fairly presented a claim in state court if he did not raise it in an appeal as of right to the Appellate Division, but only sought to raise it in an application for discretionary review in the New York Court of Appeals. Castille v. Peoples, 489 U.S. 346, 351 (1989); Ellman v. Davis, 42 F.3d 144, 148 (2d Cir. 1994) (presenting claim for first time in application seeking discretionary review is inadequate to statisfy the exhaustion requirement if discretionary review is denied), cert. denied, 515 U.S. 1118 (1995).  Finally, Petitioner's coram nobis application did not exhaust these claims either insofar as "the writ of error coram nobis lies in the state appellate court only to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of appellate counsel."  Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001)

---

[5]

The Court notes that Petitioner appears to dispute whether these claims were properly exhausted in state court by way of his *pro se* appellate brief, although it is unclear to the Court the precise legal basis/premise of this argument.  See Traverse, ¶¶ 17-18.  Petitioner asserts generally that "a review of the record will reveal that the Appellate Division decision [determining that his *pro se* appellate brief was untimely filed] was an unreasonable application of federal constitutional law." Id. at ¶ 18.  To be sure, the AEDPA standard of review -- which Petitioner appears to be invoking in his Traverse for purposes of having the Court undertake a merits-based review of these claims -- applies to claims adjudicated on the merits in the state courts.  Petitioner has not cited any relevant authority, nor is this Court aware of any, that would permit it, sitting in federal habeas review, to apply the AEDPA standard to the determination made by the Appellate Division that Petitioner's *pro se* appellate brief was procedurally defective insofar as it was not timely filed.

(quotations, alterations and citations omitted). As such, the coram nobis proceeding exhausted only Petitioner's ineffective assistance of appellate counsel claim, and not the underlying issues raised therein. See e.g., McCoy v. Walsh, No. 03-cv-1661, 2009 U.S. Dist. LEXIS 74454, 2009 WL 2707239, at * 3 (E.D.N.Y. Aug. 20, 2009) (holding that the petitioner's filing of a coram nobis petition based upon his appellate counsel's failure to raise a claim exhausted only his ineffective assistance of counsel claim, not the underlying claim upon which it was based); Mateo v. Fishkill Correctional Facility, No. CV-04-3420, 2007 U.S. Dist. LEXIS 59544, 2007 WL 2362205, at * 8 (E.D.N.Y. Aug. 14, 2007); but see Aparicio v. Artuz, 269 F.3d 78, 92 (2d Cir. 2001) (finding that petitioner's ineffective assistance of trial counsel claim had been adjudicated by Appellate Division's denial of his application for writ of error coram nobis, even though Appellate Division had not explicitly addressed that claim, because the finding that the petitioner had not been denied the effective assistance of appellate counsel disposed of the petitioner's "only proffered cause for the failure to raise the trial counsel claim on direct appeal.").

Petitioner cannot now raise these unexhausted claims because he has already used his one direct appeal and one application to the New York Court of Appeals to which he is entitled. See 22 N.Y.C.R.R. §§ 600.8(b), 500.20(a); Grey v. Hoke 933 F.2d 117, 120-

121 (2d Cir. 1991). Moreover, collateral review of these record-based claims is also foreclosed. <u>See</u> N.Y. Crim. Proc. Law ("CPL") §§ 440.10(2)(c) (motion to vacate must be denied where claim is a matter of record that could have been raised on direct appeal but unjustifiably was not).

Petitioner's procedurally defaulted claims may be reviewed by this Court only if he can demonstrate either: (1) cause for the default and actual prejudice resulting therefrom, or (2) that the failure to consider the claims will result in a "fundamental miscarriage of justice." <u>Murray v. Carrier</u>, 477 U.S. 478, 485, 495 (1986). The "fundamental miscarriage of justice" exception requires a showing of actual, not merely legal, innocence. <u>Id.</u> at 496; <u>see also</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 325 (1995). In his Traverse, Petitioner alleges ineffective assistance of appellate counsel as cause for the default. <u>See</u> Traverse, ¶¶ 12-13. Ineffective assistance of counsel can constitute cause sufficient to overcome a procedural default if the counsel's performance amounted to a constitutional violation, but "attorney error short of ineffective assistance of counsel does not constitute cause and will not excuse a procedural default." <u>McCleskey v. Zant</u>, 499 U.S. 467, 494 (1991); <u>see also</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451 (2000); <u>Coleman</u>, 501 U.S. at 752-53. In this case, Petitioner's stand-alone ineffective assistance of appellate counsel claim is meritless, and therefore cannot constitute cause for the default

(see discussion *supra* at section IV, I). Because Petitioner cannot establish cause for the default, the Court need not consider prejudice. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985). Moreover, Petitioner has not alleged facts to avail himself of the miscarriage of justice exception. Accordingly, grounds two through four, six and seven of the habeas petition are procedurally defaulted from review, and are denied.

### 3. Ground Five of the Petition is Unexhausted and Meritless

At ground five of the petition, Petitioner argues that "[he] was denied his constitutional right protected by the Eighth Amendment of the U.S. against cruel and unusual punishments." Pet. ¶ 22, Point V. For the reasons set forth below, this claim provides no basis for habeas relief.

Like the claims discussed *supra* at section IV, 2, Petitioner also raised this claim in his *pro se* appellate brief, but the Appellate Division determined that said brief was not timely filed and therefore did not consider any of the claims raised therein. Consequently, this claim also remains unexhausted for federal habeas purposes. Petitioner's failure to exhaust the Eighth Amendment claim is not fatal to this Court's disposition of his application on the merits. Because the Court finds the claim to be wholly meritless, it has the discretion to dismiss the petition notwithstanding Petitioner's failure to exhaust. See 28 U.S.C.

§ 2254(b)(2); <u>Pratt v. Greener</u>, 306 F.3d 1190, 1197 (2d Cir. 2002).

The Supreme Court has articulated a principle of "gross disproportionality" for measuring whether a prisoner's sentence violates the Eighth Amendment proscription against "cruel and unusual punishment." <u>E.g.</u>, <u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991); <u>Solem v. Helm</u>, 463 U.S. 277 (1983); <u>Rummel v. Estelle</u>, 445 U.S. 263 (1980). Only extreme sentences that are grossly disproportionate to the crimes for which they are imposed can be said to violate the Eighth Amendment. <u>See id.</u>; <u>see also</u> <u>United States v. Snype</u>, 441 F.3d 119, 152 (2d Cir. 2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare). Applying the Supreme Court's precedent on this issue, the Court finds that this case does not present one of those rare and extreme circumstances in which the Supreme Court contemplated intervention by a reviewing court into a state's sentencing decision. Here, Petitioner was sentenced, in accordance with New York law, as a second felony offender. Furthermore, the sentence meted out by the sentencing court was justified by the seriousness of the crime of which Petitioner was convicted, in which Perez sustained multiple gunshot wounds resulting in permanent, long-term injuries.

Accordingly, Petitioner's sentencing claim provides no basis for habeas relief and the claim is therefore denied.

**V.  Conclusion**

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED**.

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     October 3, 2012
           Rochester, New York